(74 South. 186)

No. 21471.

JEROLLEMAN et al. v. NEW ORLEANS TERMINAL CO.

(Feb. 12, 1917.)

*(Syllabus by the Court.)*

APPEAL AND ERROR ☞1002—VERDICT—CONFLICTING EVIDENCE—CONCLUSIVENESS.

Where, on the question of the negligence of the servants of the railroad company, in the case of a collision between one of defendant's trains and plaintiff's automobile, coming suddenly upon the track, the evidence is conflicting and contradictory, the verdict of the jury in favor of the railroad company will not be disturbed, when it does not appear to be clearly against the preponderance of the evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937.]

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Action by Samuel Jerolleman and others against New Orleans Terminal Company. Judgment for defendant, and plaintiffs appeal. Affirmed.

Louis Henry Burns and Armand Romain, both of New Orleans, for appellants. Wise, Randolph, Rendall & Freyer, of Shreveport, and Farrar, Jonas, Goldsborough & Goldberg and Dufour & Dufour, all of New Orleans (E. H. Randolph, of Shreveport, and Abraham Goldberg and George Janvier, both of New Orleans, of counsel), for appellee.

LAND, J. Plaintiff sued individually to recover $55,753.00, for personal injuries and damages, and for damages suffered by him on account of the death of his minor son, and sued as natural tutor of his three minor children, Edith, Vera, and Harry, to recover $40,000 damages sustained by them on account of the death of their mother.

The wife and son were killed on October 18, 1913, as the result of a collision between plaintiff's automobile and a train of the defendant company at a point where the latter's railroad tracks cross Canal boulevard in the city of New Orleans.

The petition alleged that on October 17, 1913, the plaintiff bought an automobile from the Ford Motor Car Company, which agreed to furnish, and did furnish, one of their regular employés to operate said automobile for the purpose of instructing the plaintiff, and that on the next day plaintiff, with his wife, son, and mother-in-law, took a ride in said car, which was in sole charge of a demonstrator furnished by said Motor Car Company, out to Spanish Fort, and the said collision took place at said crossing at about

8 p. m. on the return trip of the car to the city.

The petition alleged that his car was destroyed by the shock, and his wife, son, mother-in-law, and the demonstrator were horribly mangled and killed, and that the plaintiff was seriously and permanently injured.

The petition alleged 11 different items of negligence:

(1) That the engine was running backwards without a lookout.

(2) That the tender was ahead of the engine.

(3) That there was no lookout on the footboard of the engine.

(4) That no whistle was blown for the crossing.

(5) That the headlight on the tender was not burning.

(6) That no safety gates were erected at said crossing.

(7) That no flagman or signalman was stationed at said crossing.

(8) That the train was running within city limits and in yard limits at an excessive and dangerous rate of speed.

(9) That the night was dark and cloudy, and the train itself was dark and unlighted.

(10) That the automatic electric signal bell erected at the crossing to warn citizens of the approach of trains was worn out, and did not ring.

(11) That the engineer knew that he was approaching a crossing frequently used by pedestrians and automobiles, and that he failed to comply with the ordinary dictates of common prudence and did not have his train under control when he approached said crossing, although his view was obstructed by tall weeds then growing a short distance from the railroad track.

Defendant's answer admits the alleged collision and the death of the four persons named in the petition, and that the plaintiff was injured to some extent.

The defendant avers that the accident was caused solely and entirely by the gross negligence of Ashton Close, the driver of the automobile, in attempting to cross the tracks of the defendant without stopping to look and listen to ascertain whether or not any train or engine was approaching.

The answer further denies any negligence on the part of the defendant, and in the alternative pleads the contributory negligence of the driver of the automobile, and avers that said driver was the agent of the plaintiff in the operation of said car.

The case was tried before a jury, which found a verdict in favor of the defendant.

Plaintiff filed a motion for a new trial, which was considered and overruled by the trial judge for reasons assigned, and from a judgment pursuant to the verdict plaintiff has appealed.

Plaintiff's testimony as to how the terrible accident happened may be briefly summarized as follows:

He purchased the car on October 17, 1913, and took a drive with Close, as demonstrator. The next evening they took a run out to Spanish Fort, plaintiff and Close occupying the front seat, and his wife, son, and mother-in-law filling the rear seat. On the trip out, Close, when he got to this same crossing, said, "Now stop. Stop the machine. Always stop, look, and listen"; and he stopped the car. On the return trip, Close stopped the car at the other side of the crossing, and looked around and saw nothing.

Plaintiff looked around with Close, the same as he did, and saw nothing. Close told him to pay attention, because he would have to run the car himself. Plaintiff looked, and saw nothing, listened, and heard nothing, and the car, starting at a distance of from

140 LOUISIANA REPORTS

15 to 25 feet from the crossing, was struck as it ran on the first track, and the plaintiff was rendered unconscious.

Plaintiff was the only eyewitness called on his side of the case.

The crew of five and two car cleaners were on the train when it collided with the automobile of the plaintiff.

Two other witnesses testified that they were present on the same occasion. All seven testified in behalf of the defendant. A large number of other witnesses were called and examined by the respective parties. The testimony is conflicting and contradictory, and is too voluminous for repetition.

There was no exception to the charge of the judge, and the jury found a verdict in favor of the defendant. The presumption is that the verdict is correct.

It is hornbook law that when the evidence is contradictory, the verdict of the jury on the question of the credibility of the witnesses and other matters of fact peculiarly within its province will not be disturbed, unless manifestly erroneous. See 1 Hennen's Digest, p. 92 (b) 1.

The first three charges of negligence are based on a misconception of the structure and purpose of switch engines.

The evidence shows beyond dispute that switch engines are made to run backward as well as forward, and in either case a lookout is kept by the engineer and fireman, standing in their proper positions on the locomotive.

As to charge 4, the engineer, fireman, and others testified that the whistle of the train was blown at City Park crossing less than a quarter of a mile away, and the noise could be readily heard at the Canal Boulevard crossing, and beyond. Besides, the defendant had been notified by the city authorities that the blowing of locomotive whistles in that locality should be avoided except in cases of necessity.

Charge 5, that the headlight on the tender was not burning, is refuted by evidence that the switch engine was equipped with two oil headlights, one in front, and the other on the rear of the tender, and both were burning at the time of the collision.

The evidence further shows that such headlights were in common use, with but few exceptions.

Charge 6, that no safety gates were erected, and charge 7, that no flagman was stationed at the crossing, are not supported by the production of any city ordinance requiring such safeguards, and the evidence shows that the defendant maintained an automatic electric signal at said crossing.

Charge 9, that the night was dark and cloudy, and the train itself was dark and unlighted, was met by evidence that the engine had two headlights, and that a parlor car, which was in the train, was lighted, and that it was not customary to light up empty passenger cars under such circumstances.

Charge 10, that the automatic bell at the crossing was worn and did not ring. This was one of the main contested issues in the case. The collision took place about 8:05 p. m.

John Maher, an engineer on a New Orleans & Northeastern train, testified that his train passed the same crossing on that evening, about 7:40 or 7:42, and that the bell was ringing as he passed.

Sexton, the engineer, and Coste, the fireman, on the switch train testified positively that the automatic bell was ringing at the time of the collision.

Faulkner and Botton, switchmen, and two colored car cleaners, on the same train testified to the same effect, as did Lauglin, the switch tender, and Charles Williams, colored.

Doubtless able counsel for the plaintiff vigorously assailed the credibility of several of these witnesses before the jury, as he has done before us.

We have no means of knowing what credit the jury attached to their respective stories. But the jury might well have discredited three or four of said witnesses, and based a finding that the bell was ringing on the testimony of Maher, Sexton, Coste, Faulkner, and Bolton, or any one or more of them, as against the negative testimony of the plaintiff that he did not hear the bell ring.

Evidence that the same bell, some three hours later, on a test, was found to ring but slightly or not at all does not prove that it was not ringing at the time of the collision, because the conditions may not have been the same, and the testimony on the subject cannot be reconciled except on the hypothesis of a change of conditions after the collision.

Several practical railroad men testified that the effect of holding a train on the same circuit for several hours is to exhaust the batteries, and to stop the ringing of the automatic bell.

Harry Oldham, general yard master, testified that he reached the crossing about an hour after the collision, and heard distinctly the automatic bell ringing the danger signal for the crossing; that he remained there until about 11:45 p. m., and shortly before he left a test of the electric circuit was made, and the bell responded weakly; would hardly ring.

This witness, in answer to the question whether a train resting in the bonded circuit tends to exhaust the power of the bell, replied:

"My observations, and our instructions are, not to allow cars to stand on them, because it will exhaust the battery and put them out of use."

Item 11 is a general charge of negligence against the engineer.

The evidence tends to show that the train was running from 12 to 15 miles an hour; that the fireman was ringing the bell as the train approached the crossing; that both the fireman and conductor were keeping a proper lookout; the plaintiff's automobile coming up on the fireman's side suddenly dashed towards the track; that the fireman immediately gave the danger signal to the conductor who at once applied the air brakes, and made an emergency stop within 521 feet; and that under the prevailing conditions, an emergency stop anywhere between 500 and 600 feet would have been a good stop.

There was also evidence tending to show that the mass of high weeds referred to by the plaintiff was not on the right of way of the defendant, on which the weeds had been cut.

On such a record, we cannot say that the verdict of the jury is contrary to the preponderance of the evidence, and construe the verdict as finding that the defendant was not guilty of negligence as charged by the plaintiff.

Judgment affirmed.

MONROE, C. J., takes no part.